IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-50494
_____


W. BLAKE SMITH, JR;
PATTI FAIN SMITH,

                                        Plaintiffs-Appellees,

        versus

JEAN S. SMITH; ROBERT PAT SMITH;
TRI-COAST LIMITED PARTNERSHIP,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court for the
              Western District of Texas
                  (W-94-CV-366)

_____

                    June 30, 1997
Before GARWOOD, WIENER and DeMOSS, Circuit Judges.[*]

GARWOOD, Circuit Judge:

        Plaintiffs-appellees W. Blake Smith, Jr. (Blake) and Patti

Fain Smith (Patti), husband and wife, brought this lawsuit against

their former daughter-in-law Jean S. Smith (Jean), her son Robert

Pat Smith, Jr. (Robert Jr.), and Tri-Coast Limited Partnership

(Tri-Coast) (collectively defendants), alleging that the defendants

procured a homestead, oil properties, stocks, furniture, cash, and

_____

[*]     Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

various other items belonging to the plaintiffs through fraud, conspiracy, fraudulent misrepresentations, and unconscionable dealings. The suit was originally filed in Texas state court, and was removed to the district court below on the basis of diversity. Thereafter, a jury returned a verdict in favor of the plaintiffs awarding them compensatory and punitive damages, and the district court ordered rescission of certain transactions and imposed a constructive trust on the diverse wrongfully acquired properties to secure payment of the judgment. Unhappy with the results, the defendants now appeal. For the reasons that follow, we affirm.

## Facts and Proceedings Below

This lawsuit involves a family sadly torn apart. Plaintiffs Blake and Patti Smith, both of whom are in their eighties, are the parents of Robert Pat Smith, Sr. (Robert Sr.), the former in-laws of Robert Sr.'s ex-wife, Jean, and the grandparents of Robert Jr., Robert Sr. and Jean's only child. Plaintiffs had long provided Jean and Robert Jr. with financial support, giving them gifts and money to support their somewhat lavish lifestyle. Apparently, Jean and Robert Jr. were not satisfied with plaintiffs' generosity, as they embarked on a scheme to take complete control of plaintiffs' assets and swindle the plaintiffs out of almost everything they owned.

In 1987, Jean, citing Robert Jr.'s purported interest in journalism, convinced Blake and Patti to transfer to Robert Jr.'s

name stock that Blake owned in a newspaper in Mexia, Texas. However, very soon after Blake transferred the newspaper stock to Robert Jr., Blake discovered that he could sell the newspaper stock for a substantial sum, which he could then use to pay off some of his debts, many of which had arisen as a result of past due notes owed by Robert Sr. that Blake had signed or guaranteed. Much to their dismay, when the plaintiffs asked that the newspaper stock be put back in Blake's name, Jean and Robert Jr. refused. Plaintiffs then sought the assistance of Fred Davis (Davis), their attorney at the time. Davis set up a meeting between the plaintiffs and defendants, at which time Davis threatened to sue the defendants for the stock. Reluctantly, Robert Jr. transferred the stock back to Blake. Blake was able to sell the newspaper stock for $800,000 in cash plus a note and used the proceeds to pay off some of his debts.[1]

Undeterred by this turn of events, the defendants continued with their conspiracy to take control of plaintiffs' wealth. Sometime after Robert Jr. had reconveyed the newspaper stock to Blake, Jean persuaded the plaintiffs to enter into a written agreement whereby the plaintiffs would transfer some of Blake's oil and gas royalties, which generated approximately $5,000 per month in royalty payments, to Robert Jr. to compensate him for the

---

[1] The company that purchased the newspaper stock from the plaintiffs eventually filed for bankruptcy and was unable to pay the note.

earlier reconveyance of the newspaper stock. Overwhelmed by guilt, the plaintiffs agreed to give Robert Jr. the oil royalties.

Over the next several years, Jean and Robert Jr. persuaded the plaintiffs to sign numerous documents without legal representation and which the defendants knew the plaintiffs did not understand. These documents conveyed to the defendants, among other things, stock in Coca-Cola, AT&T, and Baby Bells owned by the plaintiffs. Defendants convinced the plaintiffs to enter into consulting agreements whereby the defendants would provide the plaintiffs with "consulting services," and in return the plaintiffs agreed to pay Jean and Robert Jr. a total of $40,000 a year for ten years. Jean induced the plaintiffs to set up the 1990 W. Blake Smith, Jr. Family Trust (1990 Family Trust). Jean, as trustee, had total control over the Trust and could withdraw money from it without consulting the plaintiffs. Also, the plaintiffs were persuaded to transfer furniture they owned to the defendants, which the defendants falsely claimed they would sell on behalf of the plaintiffs. During the course of all of these agreements and transactions, the defendants repeatedly, but falsely, assured the plaintiffs that they were acting in the plaintiffs' best interest.

In 1990, Jean convinced the plaintiffs to sell the assets of the W. Blake Smith Jr. Trust, a trust the plaintiffs had created in 1988 (1988 Trust), in order to pay off a debt on a loan from Texas American Bank of Forth Worth (Texas Bank) for nearly $1,600,000. In that Trust, Blake had contributed stock from public utilities

4

and oil royalties he owned in Gregg and Limestone Counties in Texas. Under the terms of the Trust, Blake was grantor, Tom Roberts (Roberts) was trustee, Blake and Patti were income beneficiaries for life, Robert Jr. was remainderman, and Jean was contingent remainderman. Although the 1988 Trust precluded the trustee from selling the Trust's assets and paying all of the proceeds directly to the plaintiffs as the life income beneficiaries, the trustee agreed to sell the Trust assets and pay the proceeds to Texas Bank once Blake, Patti, Jean, and Robert Jr. all consented and agreed in writing. The buyer of the royalties and stock was Tri-Coast, a California partnership of which Jean was the general partner with 2% ownership and Robert Jr. was the limited partner with 98% ownership. Tri-Coast paid the market value price for the utilities stock, but purchased the Gregg and Limestone County oil properties from the Trust for only $264,000, approximately $111,000 below their market value. As planned, the proceeds from the sale of the Trust property were applied to the Texas Bank settlement. In addition to its purchases from the Trust, Tri-Coast also purchased directly from the plaintiffs their 200 acre rural homestead with a lease back agreement for $200,000, nearly $204,000 below its market value price.

By the time the plaintiffs had realized what the defendants had done to them, almost all of their assets were taken out of their control and put in the hands of the defendants, either because the plaintiffs had conveyed the assets to the defendants

5

through gifts or sales, or the assets were in trusts that were controlled exclusively by Jean.  In November 1994, the plaintiffs filed suit against the defendants in the 87th Judicial District Court, Freestone County, Texas, alleging that the defendants had engaged in fraud, conspiracy, fraudulent misrepresentations, and unconscionable transactions in persuading the plaintiffs to enter into agreements that resulted in conveyance of plaintiffs' properties and cash to the defendants.  Defendants removed the case to the district court below on the basis of diversity.  A jury returned a verdict in favor of the plaintiffs, finding the defendants liable to the plaintiffs for compensatory and punitive damages.  Plaintiffs moved for a temporary restraining order and preliminary injunction, which the court granted.  The district court entered a Judgment Upon Jury Verdict and Judgment of Severance, awarding damages, ordering rescission of various transactions, and imposing a constructive trust on the fraudulently acquired properties to secure payment of the judgment.[2]  The court later issued a "final injunction" enjoining the defendants "pending finality of judgment to be entered in this cause" from "selling, encumbering, otherwise disposing of or damaging" various properties and proceeds obtained by the defendants through their fraud. Defendants timely appealed.

### Discussion

---

[2]    Jean and Tri-Coast filed for bankruptcy; these filings were both later dismissed.

6

On appeal, the defendants raise various arguments. They contend that the district court erred by imposing a constructive trust on the unlawfully acquired properties and by ordering rescission of various transactions in addition to awarding damages for those same transactions. Defendants also complain that service of process was improper; the court impermissibly terminated the irrevocable 1988 Trust; there was insufficient evidence to support the jury's finding of fraud vis-à-vis the 1987 oil royalties agreement and conveyance; the jury instructions on the statute of limitations issue were erroneous; and the court issued the "final injunction" without adequate notice to the defendants. We address each argument in turn below.

I.  Constructive Trust

Defendants' first argument on appeal is that the district court erred by imposing a constructive trust on the properties and proceeds in order to enforce its judgment awarding the plaintiffs damages. This Court reviews the district court's decision to impose a constructive trust for abuse of discretion. *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996); *Stephens v. Stephens*, 877 S.W.2d 801, 805 (Tex.App.——Waco 1994, writ denied).

Generally, a court will impose a constructive trust "where equity and justice demand." *Durham*, 86 F.3d at 73 (citation omitted). "A constructive trust is an equitable tool in a court's power that can infer a fiduciary-like relationship within a

7

transaction for the purpose of promoting justice." *Harris v. Sentry Title Co., Inc.*, 715 F.2d 941, 946 (5th Cir. 1983), *modified on other grounds*, 727 F.2d 1368 (5th Cir.), *cert. denied*, 105 S.Ct. 514 (1984). In order for a court to impose a constructive trust, there must be a breach of an informal relationship of special trust arising prior to and apart from the transaction made the basis of the law suit, or actual fraud, unjust enrichment on the part of the wrongdoer, and tracing to an identifiable res. *Matter of Monnig's Dept. Stores, Inc.*, 929 F.2d 197, 201 (5th Cir. 1991); *see also Hamblet v. Coveney*, 714 S.W.2d 126, 128 (Tex.App.——Houston [1st Dist.] 1986, writ ref'd n.r.e.). With respect to the existence of a prior confidential relationship, the Texas Supreme Court has explained that

> "[w]hile a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust, *and the courts are careful not to limit the rule or the scope of its application by a narrow definition of fiduciary or confidential relationships protected by it. An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one.*" *Hamblet*, 714 S.W.2d at 128 (*quoting Fitz-Gerald v. Hull*, 237 S.W.2d 256, 261 (Tex. 1951)) (emphasis in original).

In this case, all of the requirements of a constructive trust are satisfied. Not only did a prior confidential relationship

8

exist between the plaintiffs and individual defendants——plaintiffs'
grandson and former daughter-in-law——but the jury specifically
found that the defendants engaged in actual fraud. Defendants also
were unjustly enriched by their illegal endeavors, acquiring almost
all of plaintiffs' assets through fraud, conspiracy, fraudulent
misrepresentations, and unconscionable transactions. And, the
plaintiffs were able to trace the properties and proceeds that the
defendants had acquired through their fraud. Furthermore, given
defendants' past conduct, a constructive trust could properly be
found to be necessary to prevent the defendants from disposing of
the properties in a manner that would be adverse to the interests
of the plaintiffs. On these grounds, we believe the equities
undoubtedly justify the imposition of the constructive trust, and
the district court's decision to do so was not an abuse of
discretion.

II. Rescission

Next, the defendants argue that the lower court violated the
doctrine of election of remedies by ordering rescission of certain
transactions while also awarding the plaintiffs damages of $725,000
and not requiring the plaintiffs to return the consideration paid
by the defendants.[3] Specifically, the defendants claim that the

---

[3] The doctrine of election of remedies——designed to prevent a
plaintiff from receiving double recovery for a single wrong——bars
relief when one has made an informed choice between two or more
remedies, rights, or states of facts which are so inconsistent as
to constitute manifest injustice. *See Bocanegra v. Aetna Life Ins.
Co.*, 605 S.W.2d 848, 851 (Tex. 1980).

9

plaintiffs should not be awarded $725,000 in damages while also recovering through rescission (1) the oil royalties that Blake conveyed to Robert Jr. in 1987; (2) the oil properties purchased by Tri-Coast from the 1988 Trust; and (3) the sum of $220,000 and two platinum bar pins from Jean.

A.   Rescission of the 1987 Conveyance of Oil Royalties

Defendants maintain that the court erroneously awarded the plaintiffs double recovery by ordering rescission of the 1987 conveyance of oil royalties from Blake to Robert Jr.——which the jury found to be fraudulent——while also awarding the plaintiffs damages caused by the conveyance and, on top of that, allowing Blake to keep the "consideration" that Robert Jr. paid in exchange for the royalties, i.e the Mexia newspaper stock.

In theory, the defendants are correct in that, as a general rule, the plaintiffs may not have a transaction rescinded while also recovering damages caused by that same transaction. *See Ehrlich v. United States*, 252 F.2d 772, 776 (5th Cir. 1958) (stating that "[t]he object, of course, of an equitable suit for rescission is to restore the status quo, not to punish the transgressor. The harm should be undone but there is no reason to reward the victim."); *Kargar v. Sorrentino*, 788 S.W.2d 189, 191 (Tex.App.——Houston [14th Dist.] 1990, no writ) (explaining that rescission and damages are, as a general rule, mutually exclusive remedies). Such is not the case here, however. Indeed, contrary

10

to defendants' assumption, the $725,000 in damages awarded by the jury did not include any damages caused by the 1987 oil royalties conveyance. Plaintiffs never asked for any damages for the 1987 conveyance either in their pleadings or in argument or otherwise at trial. In their pleadings, the plaintiffs made only general requests for damages; they did not specifically ask for damages emanating from the 1987 conveyance. Also, the plaintiffs during trial did not seek damages with respect to the 1987 conveyance. In fact, they disclaimed any such recovery. In their closing arguments, the plaintiffs presented their request for damages to the jury as follows:

> "I want to tell you what we believe our damages are in this case. . . . They paid $264,000, Tri-Coast did. We have appraisals from 'Tom' Hilton as to fair market value—and you'll notice that there—they got no appraisal, there is no evidence—that's $111,000. Homestead—that's the difference between what they paid and the fair market value. And the Court charges—tells you, they have a duty to treat them fairly and make these determinations. They paid 200,000, appraised at 404,000; that's $204,000 difference. The AT&T and Baby Bells, they didn't really pay anything, they just got that transferred. . . . That figure is 76,569 that's—that's the figure from the tax returns, that's what Jean sold the—that's what Jean sold the AT&T and Baby Bells for, under her tax returns, in January of 1991.
>
> The Coca-Cola stock, she—Jean, according to her tax returns, she sold 2,000 shares for $116,109. That's an average price of $58.04. You multiply that times 5,280 and you get $306,504. *So we say 698,073. Those are the damages we've got. We don't claim damages for anything else.* All of the other things that they've done, the money they have received, we only ask with respect to these particular items." (emphasis added).

The jury returned a verdict that included, among other things,

11

an award of damages for $725,000, which is only slightly higher than the $698,073 requested by the plaintiffs during closing arguments and which is consistent with evidence presented by the plaintiffs concerning damages in respect to items as to which recision was not ordered. We essentially agree with the district court's conclusion that the jury could have rationally calculated the damages award as follows: $204,000 for the homestead loss; $111,000 for the oil royalties loss; $306,504 for the Coca-Cola stock loss; $76,659 for the AT&T and Baby Bells stock loss; and $30,700 for furniture loss. Because our review of the evidence reveals that the damages award did not include any damages from the 1987 oil royalties conveyance, we affirm the rescission order.

Furthermore, the plaintiffs need not return to the defendants the proceeds from the sale of the newspaper stock, as we are satisfied that the jury could have properly concluded that the newspaper stock did not act as "consideration" for reconveyance of the oil royalties. The evidence shows that when Blake asked for return of the stock so that he could pay off his debts, Robert Jr. and Jean refused. Only after plaintiffs' attorney threatened to sue the defendants did they agree to give the stock back to Blake. It was not until after Robert Jr. gave the newspaper stock back to Blake that the defendants, taking advantage of plaintiffs' trust and generosity, fraudulently convinced the plaintiffs to give Robert Jr. the oil royalties. Thus, the jury could have found, based on the evidence, that the defendants transferred the

12

newspaper stock to the plaintiffs, not as consideration in exchange for the newspaper stock, but because the defendants knew that failure to reconvey the stock to Blake would likely result in a lawsuit. Additionally, the jury could have concluded that the motive behind transferring the newspaper stock to Robert Jr. was merely to get title in Robert Jr.'s name to avoid Blake's creditors, and that there was never anything more than a nominal transfer of the stock into Robert Jr.'s name. Accordingly, the defendants are not entitled to the proceeds from the sale of the newspaper stock.

Under all the particular circumstances here, the recision order has not been shown to constitute an abuse of discretion. *See Durham*, 86 F.3d at 72.

B. 1988 W. Blake Smith, Jr. Trust

Defendants next contend that to award the plaintiffs actual and exemplary damages, order the defendants to turn over to the plaintiffs the oil properties purchased by Tri-Coast from the 1988 Trust, and at the same time allow the plaintiffs to avoid returning to the defendants the $264,000 they paid for the oil properties, amounts to double recovery and, therefore, violates the doctrine of election of remedies.

Defendants apparently misinterpret the district court's judgment, as the judgment does *not* order rescission of the sale of the oil properties purchased by Tri-Coast from the 1988 Trust. The

13

court's Judgment Upon Jury Verdict and Judgment of Severance, signed and entered *nunc pro tunc* on April 5, 1996, orders rescission of only a handful of transactions: (1) the 1987 agreement to transfer oil royalties to Robert Jr. for reconveyance of the newspaper stock and the actual conveyance of those oil royalties; (2) a handwritten agreement dated February 8, 1988; (3) various releases entered into in 1989; (4) the 1990 and 1992 Consulting Agreements; (5) the 1990 Family Trust; and (6) various powers of attorney.[4] The judgment also specifically orders the defendants to reconvey to the plaintiffs title and ownership in the oil royalties transferred to Robert Jr. in 1987 as well as all properties held in the 1990 Family Trust. Nowhere in the judgment does the court require the defendants to return to the plaintiffs the oil properties purchased by Tri-Coast from the 1988 Trust. Because the latter oil properties are not subject to the rescission order, the plaintiffs' damages in respect thereto do not amount to double recovery.[5]

C. $120,000 and Platinum Bar Pins

---

[4] Although the judgment originally called for rescission of the "1980" Family Trust, this typographical error was later changed by the court to read "1990" Family Trust.

[5] Our conclusion that the judgment does not order the defendants to return to the plaintiffs the oil properties purchased by Tri-Coast necessarily renders moot defendants' contention that they should get back the $264,000 Tri-Coast paid for the oil properties. The judgment allows the defendants to keep the oil properties, and simply orders them to pay the plaintiffs the difference between the price the oil properties should have been sold for and the reduced price actually paid by Tri-Coast: $111,000.

14

Defendants' complaint that the plaintiffs are not entitled to the award of $220,000 and return of the two platinum bar pins, in addition to the $725,000 in damages, is without merit. As an initial matter, we note that the defendants did not raise this argument in their opening brief; therefore, we consider the argument waived. *See Graef v. Chemical Leaman Corp.*, 106 F.3d 112, 115 n.2 (5th Cir. 1997).

However, even if we were to reach the merits of defendants' argument, we would nevertheless affirm the rescission order. The jury found that Patti gave to Jean $120,000 in cash *and* two platinum bar pins to hold for her (Patti). The jury also awarded the plaintiffs $100,000 in punitive damages as against Jean. In its final judgment, the court simply orders Jean to pay the *punitive* damages ($100,000) *and* give the $120,000 and bar pins back to Patti. As discussed earlier, the $725,000 was awarded for damages relating solely to the transfer of stocks and furniture to the defendants and the sale of the oil properties to Tri-Coast——damages stemming from causes of action that were completely unrelated to the additional allegation that Patti gave to Jean $120,000 in cash and two platinum bar pins to hold for her. The court's award of $220,000 and order that Jean return the platinum bar pins do not overlap with the $725,000 in damages; hence, there is no multiple recovery.

III. Service of Process

15

Defendants maintain that Jean, although properly served with the original complaint in her individual capacity, was never properly served in her capacity as trustee of the 1990 Family Trust with plaintiffs' first amended complaint, which added her as a party in her trustee capacity. Because of this defect in service of process, defendants contend, the district court did not have jurisdiction over Jean as trustee or the 1990 Family Trust and, thus, the judgment as it relates to Jean as trustee and the 1990 Family Trust must be vacated.

In Plaintiffs' Motion For Leave to File First Amended Complaint, the plaintiffs requested leave to amend their complaint to add Jean as trustee of the 1990 Family Trust, which the court subsequently granted. Instead of serving Jean with the amended complaint, however, the plaintiffs mailed a copy of the amended complaint to Stephen Fontaine, Jean's attorney in the litigation.

Despite having the opportunity to do so, the defendants did not raise any objections to improper service of process on Jean as trustee prior to trial. Instead, they waited until they filed their Response to Plaintiffs' Motion for Judgment to raise their objection. Indeed, at trial, Jean testified extensively about the 1990 Family Trust and her role as trustee of the Trust without raising any objections to service of process or the court's jurisdiction over her as trustee. Because Jean never objected to improper service of process below, she may not now complain of

improper service to this Court. *See Trust Co. of Louisiana v. N.N.P. Inc.*, 104 F.3d 1478, 1487 (5th Cir. 1997) (stating that "[t]he Federal Rules do not in any way suggest that a defendant may halfway appear in a case, giving plaintiff and the court the impression that he has been served, and, at the appropriate time, pull failure of service out of the hat like a rabbit in order to escape default judgment") (*quoting Broadcast Music, Inc. v. M.T.S. Enterprises, Inc.*, 811 F.2d 278, 281 (5th Cir. 1987)); *Kersh v. Derozier*, 851 F.2d 1509, 1511 (5th Cir. 1988) (stating that "[u]nder Rule 12(h)(1)(B), the defense of insufficient service of process is waived unless made in a party's first responsive pleading or an amendment to a first responsive pleading allowed as a matter of course."); *see also* 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1391 p. 752 (1990) (explaining that 12(h)(1) of the Federal Rules of Civil Procedure "advises a litigant to exercise great diligence in challenging . . . service of process. If he wishes to raise any of these defenses he must do so at the time he makes his first significant defensive move—whether it be by way of a Rule 12 motion or a responsive pleading.").[6]

---

[6] Defendants also contend that the trustee of the 1988 Trust, Tom Roberts, and the 1991 and 1994 Robert Pat Smith, Jr. Trusts should have been joined as defendants in this suit, as the judgment directly affects the properties once held by these trusts. We deem these eleventh hour arguments waived, however, as the defendants did not raise these joinder challenges until after the case was submitted to the jury. *See Judwin Properties, Inc. v. United*

IV.  *De Facto* Termination of the 1988 Trust

Next, the defendants argue that the court erred by ordering them to pay the plaintiffs damages arising from the sale of the oil properties in the 1988 Trust to Tri-Coast when, instead, the court should have ordered that the damages be paid to the Trust.  This, according to the defendants, along with the court's mandate that the defendants reconvey the oil properties purchased by Tri-Coast back to the plaintiffs while allowing the plaintiffs to retain the consideration that Tri-Coast paid for the properties, constitutes a *de facto* termination of the otherwise irrevocable 1988 Trust.

As stated earlier, the judgment does *not* require the defendants to reconvey any of the oil properties purchased from the 1988 Trust back to the plaintiffs.  Because the defendants are allowed to keep the properties, the district court correctly allowed the plaintiffs to retain the $264,000 acquired from the sale of the properties.

We also reject defendants' argument that the court's decision to award damages to the plaintiffs effectively terminated the 1988 Trust.  We understand the court's judgment to be simply a recognition by the court that the 1988 Trust had already been

---

*States Fire Ins. Co.*, 973 F.2d 432, 434 (5th Cir. 1992); *see also Gil Enterprises, Inc. v. Delvy*, 79 F.3d 241, 247-48 (2d Cir. 1996). Furthermore, as to the 1991 and 1994 Robert Pat Smith, Jr. Trusts, the defendants fail to explain intelligibly how these trusts are relevant to the jury's verdict, the court's judgment, or this appeal.

18

terminated by all the parties concerned in it long before the suit was even filed. Upon agreement by all of the parties necessary to effectuate a termination of the Trust——that is, Blake, Patti, Jean, Robert Jr., and the trustee of the 1988 Trust——Tri-Coast purchased all of the Trust's property, the proceeds of which were applied to the Texas Bank settlement. By agreeing to sell all of the Trust property, and thereby depleting the Trust of all its assets, the parties in essence agreed to terminate the Trust. *See Musick v. Reynolds*, 798 S.W.2d 626, 629 (Tex.App.——Eastland 1990, writ denied). Because it was the parties, and not the court, who terminated the Trust, the court did not, either expressly or *de facto*, revoke the Trust by ordering the defendants to pay the damages from the sale of the oil properties to the plaintiffs.

V. Sufficiency of the Evidence

Defendants contend that there was insufficient evidence to support the jury's finding of fraud with respect to the 1987 agreement to transfer the oil royalties in exchange for the newspaper stock and the actual conveyance of the oil royalties to Robert Jr. The defendants, however, failed to make a motion for judgment as a matter of law on their insufficiency of the evidence claims; therefore, these claims are not properly preserved for review. "The sufficiency of the evidence supporting jury submission of a case or the jury's findings is not reviewable on appeal unless the party seeking review has made a motion for a

19

directed verdict in the trial court." *Little v. Bankers Life & Cas. Co.*, 426 F.2d 509, 510 (5th Cir. 1970); *see also Quinn v. Southwest Wood Products, Inc.*, 597 F.2d 1018, 1024-25 (5th Cir. 1979); *House of Koscot Development Corp. v. American Line Cosmetics, Inc.*, 468 F.2d 64, 67 (5th Cir. 1972); 9A C. Wright & A. Miller, *Federal Practice and Procedure* §§ 2536 pp. 329-34 (1995). If a party fails to make a timely motion to the trial court, this Court's "consideration is limited to whether plain error [was] committed which, if not noticed, would result in a manifest miscarriage of justice." *Little*, 426 F.2d at 511; *see also Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 397 n.2 (5th Cir. 1995); *House of Koscot Development. Corp.*, 468 F.2d at 67. In other words, although we may not question the sufficiency of the evidence, we may inquire whether there was *any* evidence supporting the submission of the issue to the jury. *House of Koscot Development. Corp.*, 468 F.2d at 68 n.5.

Applying this standard of review, we cannot say that the plaintiffs failed to present at trial at least some evidence of fraud with respect to the 1987 agreement and conveyance of oil royalties to Robert Jr. Plaintiffs presented evidence that at the meeting where Robert Jr. reconveyed to Blake the newspaper stock, neither Jean nor Robert Jr. mentioned anything about an agreement to transfer oil royalties to Robert Jr. in exchange for reconveyance of the newspaper stock. There was evidence that the

20

written agreement to transfer the oil royalties to Robert Jr. was entered into *after* Robert Jr. had already reconveyed the newspaper stock to Blake. Moreover, the plaintiffs demonstrated that both Jean and Robert Jr. viewed the oil royalties as a gift and treated the royalties as such on their tax returns. The plaintiffs presented some evidence of fraud as to these transactions, and because no miscarriage of justice would result from upholding the jury's findings, we reject defendants' sufficiency of the evidence claim.

VI.  Statute of Limitations Jury Instructions

Defendants complain that the district court, over defendants' objections, erroneously submitted only a single jury interrogatory on the statute of limitations issue. Defendants assert that because the jury was specifically asked about twenty-six fraudulent transactions, a separate statute of limitations interrogatory should have accompanied each of those fraud interrogatories.

This Court reviews a challenge to jury instructions under a two-step approach. First, the challenge must demonstrate that the jury charge, as a whole, creates a substantial and ineradicable doubt that the jury has been properly guided in its deliberations. Second, even if the jury instructions were erroneous, we will nevertheless affirm the verdict if, based upon the entire record, we conclude that there is no reasonable possibility that the instructions affected the outcome of the case. *Flores v. Cameron County, Tex.*, 92 F.3d 258, 262 (5th Cir. 1996); *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1216 (5th Cir. 1995).

21

The statute of limitations jury interrogatory asked, "Do you find that Plaintiffs knew or should have known of Defendants' alleged fraudulent actions before November 11, 1990?", to which the jury answered "No." The court further instructed the jury that

"In addition to denying liability in the present case, the Defendants have asserted that the Plaintiffs' claims against them are barred by the statute of limitations. You are instructed that the four year statute of limitations is applicable to Plaintiffs' claims against the Defendants.

You are further instructed that the Plaintiffs have alleged that they did not discover the Defendants' alleged fraudulent activities until the Fall of 1993. If W. Blake Smith, Jr. and Patti Fain Smith were not aware of Defendants' alleged fraudulent activities, or the Defendants concealed their alleged fraudulent activities, the statute of limitations does not begin to run until the time the fraud is discovered or could have been discovered by W. Blake Smith, Jr. and Patti Fain Smith's exercise of reasonable diligence.

If you find from a preponderance of the evidence that W. Blake Smith, Jr. and Patti Fain Smith did not discover or should not have discovered the alleged fraudulent activities of the Defendants prior to November 10, 1990, then as a matter of law you must find that the Plaintiffs' claims are not time barred."

The jury instructions correctly incorporated the residual four-year statute of limitations applicable in actions for fraud. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051 (Vernon 1986). The instructions also accurately and clearly explained that the statute of limitations does not begin to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence. *Artymae Little, Estate of Frank J. Little, M.D. v. Katherine Irene Barber Smith*, No. 95-0744, 1997 WL 43243, *6 (Tex. Jan. 31, 1997). We are not convinced that the

22

instructions, as a whole, create a substantial and ineradicable doubt that the jury was improperly guided, nor do we believe that the instructions affected the outcome of the case. No reversible error is shown in this respect.

VII.  Final Injunction

Defendants's final argument on appeal is that the district court erroneously issued the "final injunction," as the plaintiffs in their pleadings asked only for a temporary restraining order and preliminary injunction, and not for a permanent injunction. Because the plaintiffs never included in their pleadings a request for a permanent injunction, the defendants maintain that they were not put on notice of the injunction and, thus, the court should not have issued the injunction.

Although the plaintiffs, as the defendants correctly note, asked only for a temporary restraining order and preliminary injunction, the record contradicts the defendants' assertion that they were never put on notice of the "final injunction." Indeed, the record shows that the defendants were informed by plaintiffs' attorneys and the court in advance of the post-verdict hearing which led to the "final injunction" that the scheduled hearing was to be on plaintiffs' request for "a permanent injunction" and was "to determine . . . an appropriate injunctive order." Moreover, the defendants do not explain how they are harmed by the "final injunction," as the injunction merely extends the preliminary injunction until the judgment becomes final, and also serves a purpose substantially similar to that of the constructive trust

23

imposed by the court (the injunction covers no items not covered by the constructive trust or the recision judgment).[7]  Defendants' confusing contentions respecting the "final injunction" present no reversible error.

## Conclusion

For the foregoing reasons, the judgment below is

AFFIRMED.

---

[7]  Defendants claim that the language of the Order of Final Injunction, which provides that the injunction will be in effect "pending finality of judgment to be entered in this cause," is somewhat confusing, and defendants seem to suggest that somewhere within that confusion lies an appellate claim.  Because we are unable to discern what relief the defendants are asking for, nor are we able to perceive of any viable argument the defendants might have respecting the final injunction, we find defendants' argument meritless.